UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 3:17CR114-RJC |
| ) | |
| ) | **BILL OF INDICTMENT** |
| ) | |
| v. ) | Violations: |
| ) | |
| ) | 15 U.S.C. §§ 78j and 78ff |
| ) | 18 U.S.C. § 1001(a)(3) |
| **(1) ROBERT M. BOSTON** ) | 18 U.S.C. § 1343 |
| **(2) ROBERT S. LABARGE** ) | 18 U.S.C. § 1344(2) |
| ) | 18 U.S.C. § 1349 |
| ) | 18 U.S.C. § 1956(h) |
| ) | |

**THE GRAND JURY CHARGES:**

<u>Introductory Allegations</u>

At times material to this Indictment:

1. From in or about July 2012 through in or about August 2015, Defendants ROBERT M. BOSTON and ROBERT S. LABARGE defrauded franchisees, investors, and lenders of their company, ZLOOP. In addition to deceiving their victims through false and misleading franchise and securities offering documents, Defendants created fake documents to perpetuate their fraud. Through their fraud, Defendants obtained millions of dollars, much of which they spent on expensive personal real estate, a private plane, and the racing career of ROBERT M. BOSTON's son.

2. ZLOOP, Inc. ("ZLOOP" or the "Company") was a Delaware corporation with its headquarters and principal place of business in Hickory, North Carolina. ZLOOP was an electronic waste recycling company. Originally founded as a limited liability company in 2012, ZLOOP converted to a corporation in or about 2014.

3. DEFENDANT ROBERT M. BOSTON was one of the two principal founders of ZLOOP. He served as ZLOOP's Chief Executive Officer and as a director of ZLOOP.

4. DEFENDANT ROBERT S. LABARGE was one of the two principal founders of ZLOOP. He served as ZLOOP's Chief Marketing Officer and as a director of ZLOOP.

5. Victim 1 was an individual residing in Louisiana.

6. Patriot Bank was a federally insured financial institution based in Texas.

## The Franchise Misstatements and Omissions

7. In or about July 2012, shortly after its founding, ZLOOP began marketing franchise opportunities. On or about July 23, 2012, ZLOOP issued a press release announcing its franchise offerings, stating that it "anticipate[d] the opening of more than 100 franchises nationwide within the coming year and more than 455 by 2015."

8. Federal law requires a potential franchisor to provide a prospective franchisee with a franchise disclosure document. Under Item 3 of the franchise disclosure document, the franchisor must disclose certain litigation matters, including whether, in the 10-year period immediately before the disclosure document's issuance date, any director, trustee, general partner, principal officer, or any other person with management responsibility relating to the sale and operation of franchises had been held liable in a civil action involving allegations of fraud, unfair or deceptive practices, or comparable allegations.

9. Under Item 4 of the franchise disclosure document, the franchisor must disclose whether any officer or any other individual who had management responsibility relating to the sale and operation of franchises had filed bankruptcy or been a principal officer of a company that had a bankruptcy petition filed against it.

10. In or about 2012, BOSTON and LABARGE offered to sell ZLOOP franchises using franchise disclosure documents which omitted the following information:

   a. In or about July 2008, an involuntary bankruptcy petition was filed against BOSTON's former company, D.B. Concrete Construction, Inc. ("D.B. Concrete");

   b. The D.B. Concrete bankruptcy did not close until in or about April 2013;

   c. In or about July 2010, BOSTON filed for personal bankruptcy;

   d. In or about November 2010, a lender filed a complaint against BOSTON alleging that BOSTON "intentionally caused D.B. Concrete, through his direct actions, (i) to submit knowing[ly] false financial documentation to [the lender] in order to obtain a line of credit of $2.9 Million and to draw down on said line of credit and (ii) to engage in fraudulent check-writing activities that resulted in a negative balance in D.B. Concrete's business account with [the lender]."; and

   e. In or about April 2011, BOSTON was held liable in the action filed by the lender.

11. Rather than disclosing material information as required, the ZLOOP franchise disclosure document falsely stated under Item 3, "There is no litigation that must be disclosed in

this document." Moreover, in versions of the ZLOOP franchise disclosure document provided to prospective franchisees, Defendants deleted Item 4 (Bankruptcy) entirely.

12. Using fraudulent versions of the ZLOOP franchise disclosure document, BOSTON and LABARGE offered to sell ZLOOP franchises to prospective franchisees, and did sell ZLOOP franchises to franchisees, including Victim 1.

13. On or about October 30, 2012, Victim 1 wired approximately $2,989,179 to ZLOOP, in part for the purchase of ZLOOP franchises. Approximately three days later, ZLOOP transferred about $421,732.55 in a related party transaction, namely to pay for a condominium for BOSTON.

14. Shortly after Victim 1 purchased franchises from ZLOOP, Victim 1 also provided a loan to the Company. On or about December 17, 2012, Victim 1 and BOSTON signed a promissory note reflecting this loan.

15. On or about December 18, 2012, Victim 1 wired $1,700,000 to ZLOOP's account. Approximately one day later, ZLOOP transferred about $818,626.99 in a related party transaction, namely to pay for a lakehouse for LABARGE.

16. On or about January 3, 2013, Victim 1 wired $1,800,000 to ZLOOP's account. Approximately one day later, ZLOOP transferred about $323,944.50 in a related party transaction, namely to pay for a condominium for BOSTON.

### The Misleading Private Placement Memo

17. In or about December 2012, ZLOOP began preparing a private placement memorandum. The ZLOOP private placement memorandum was used to market ZLOOP securities to potential investors.

18. Versions of the ZLOOP private placement memo (the "ZLOOP PPM") that BOSTON and LABARGE caused to be sent to potential investors omitted material information. For example, these versions of the ZLOOP PPM omitted the information set forth in subparagraphs 10(a) through 10(e) of this Bill of Indictment and the related party transactions described in paragraphs 13, 15, and 16. These half-truths and omissions caused the ZLOOP PPM to be materially misleading.

19. Versions of the ZLOOP PPM that BOSTON and LABARGE caused to be sent to potential investors stated that ZLOOP was offering up to $10,000,000 of equity in the Company. On or about March 21 and 22, 2013, investors wired more than $2,000,000 to ZLOOP's account, much of which BOSTON immediately spent on March 22, 2013. The Company never raised $10,000,000 under the ZLOOP PPM, however, and in or about the middle of 2013, investors in ZLOOP asked BOSTON and LABARGE for their money back.

### The Fraudulent UCC Financing Statement

20. To repay its other investors, ZLOOP sought another loan from Victim 1. While

doing so, BOSTON and LABARGE sent falsified documents to J.J., an associate of Victim 1.

21. In or about September of 2013, BOSTON represented to J.J., in person, that ZLOOP would file a UCC financing statement in favor of Victim 1 if Victim 1 made an additional loan to ZLOOP. On or about September 25, 2013, BOSTON represented to J.J. that, "[p]er our conversation when you and [Victim 1] were in Hickory. Upon receipt of all information on recycling equipment we will File [sic] a UCC1 lien on the equipment in the amount of 2Million [sic] dollars."

22. On or about October 7, 2013, Victim 1 wired $3,000,000 to ZLOOP. On the same day, ZLOOP wired approximately $2,562,575.34 to repay the investors who had purchased equity in ZLOOP under the misleading ZLOOP PPM.

23. On or about December 5, 2013, LABARGE emailed to J.J. a document purporting to be a UCC financing statement acknowledging Victim 1's interest in "[a]ll goods, tools, machinery, furnishings, furniture and other equipment and fixtures of every kind now existing." The document falsely indicated that it had been filed with the North Carolina Secretary of State two days earlier. In truth and fact, it never had been and never was filed with the North Carolina Secretary of State. LABARGE copied BOSTON on the email attaching this fraudulent UCC financing statement, writing "Per Bob Boston, attached."

## The Patriot Bank Line of Credit

24. Several days before LABARGE sent the fraudulent UCC financing statement, BOSTON emailed J.J. and suggested that Victim 1 provide ZLOOP with a letter of credit. BOSTON also suggested that ZLOOP obtain a $5,000,000 line of credit from a bank.

25. Victim 1 agreed to secure a $5,000,000 line of credit for ZLOOP and, on or about December 17, 2013, Patriot Bank provided a $5,000,000 line of credit to ZLOOP secured by Victim 1.

26. BOSTON and LABARGE signed a bank document stating that the specific purpose of this line of credit was "WORKNG [sic] CAPITAL FOR NEW BUSINESS LOCATION."

27. On or about December 19, 2013, BOSTON caused ZLOOP to draw down approximately $3,500,000 from the Patriot Bank line of credit. Rather than using the proceeds exclusively for a new business location, BOSTON and LABARGE used the proceeds in part as follows:

    a. On or about December 23, 2013, BOSTON spent approximately $70,583.02 of ZLOOP's funds to purchase a 2014 Chevrolet Corvette.

    b. On or about December 26, 2013, LABARGE spent approximately $85,202.65 of ZLOOP's funds to purchase a 2014 Jeep Grand Cherokee for himself and a 2014 Chrysler Town and Country for his wife.

    c. On or about December 27, 2013, BOSTON wired approximately $32,000 of

ZLOOP's funds to a luxury watch seller.

d. On or about January 8, 2014, LABARGE wired approximately $425,000 of ZLOOP's funds to purchase a Beechcraft King Air airplane titled in the name of The Hooch House, LLC, a company controlled by BOSTON and LABARGE.

28. On March 21, 2014, LABARGE emailed ZLOOP's financial advisors, copying BOSTON, and wrote, in part,

> We want to raise our LOC [line of credit] another $8M [million] to get accomplish [sic] the following :
>
> Order processing equipment for compressors and electric motors in Hickory, NC in order to meet our contractual obligations
>
> Purchase Reno property attached (offer has been made)
>
> Order processing equipment for Reno Plant
>
> 2 tractors to pull our trailers (one in Hickory, the other in Reno)
>
> 6 months working capital for both plants

On or about the same day, BOSTON forwarded this email to J.J., representing that these uses were the rationale for the increase in the line of credit.

29. On or about April 29, 2014, at ZLOOP's request, Patriot Bank increased the amount available under the line of credit to $14,000,000. Like the original line of credit, Victim 1 agreed to secure this increase in the line of credit.

30. On or about May 2, 2014, Patriot Bank released approximately $1,300,000 from the line of credit to ZLOOP. Rather than spending these funds in the manner promised in LABARGE's March 21, 2014 email, ZLOOP immediately spent more than $500,000 on racing-related expenditures, and approximately $79,808 on a suite at a professional football stadium.

### BOSTON and LABARGE's Attempts to Cover Up the Fraudulent UCC Financing Statement

31. On or about August 6, 2015, ZLOOP filed for bankruptcy. On or about August 19, 2015, BOSTON and LABARGE caused ZLOOP's bankruptcy counsel to send Victim 1's counsel a draft complaint seeking damages against Victim 1 and others in the amount of approximately $100 million. The draft complaint falsely alleged that the UCC financing statement described in paragraph 23 of this Bill of Indictment was merely a draft statement intended to be a sample of what *might* be filed. The draft complaint also alleged that BOSTON and LABARGE had never represented to Victim 1 that the UCC financing statement was to perfect a security interest in

ZLOOP's assets. As BOSTON and LABARGE knew, these allegations were false and misleading.

32. On or about July 6, 2016, LABARGE provided to an agent of the Federal Bureau of Investigation a version of the email attaching the UCC financing statement described in paragraph 23 of this Bill of Indictment bearing the subject line "UCC1 TBF [VICTIM 1]," and stated that this subject line indicated that the attached UCC financing statement was a draft statement intended to be filed by Victim 1. This statement was false because, as LABARGE knew, the email that he actually sent on or about December 5, 2013 bore the subject line "UCC1," and did not indicate that its attachment was a draft statement to be filed by Victim 1.

## COUNT ONE

### 18 U.S.C. § 1349
### (Conspiracy to Commit Wire and Bank Fraud)

33. The Grand Jury incorporates paragraphs 1 through 31 of this Bill of Indictment and further alleges that:

34. From at least in or about 2012 through in or about 2015, in Mecklenburg and Catawba Counties, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) ROBERT M. BOSTON**
**(2) ROBERT S. LABARGE**

and others known and unknown to the Grand Jury did knowingly combine, conspire, confederate and agree:

    a. To commit wire fraud in violation of 18 U.S.C. § 1343; and

    b. To commit bank fraud in violation of 18 U.S.C. § 1344.

### Objects of the Conspiracy

35. *Wire Fraud.* It was a part and an object of the conspiracy that the defendants, and others known and unknown to the Grand Jury, having devised the above-described schemes and artifices to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purposes of executing said schemes and artifices, in violation of Title 18, United States Code Section 1343.

36. *Bank Fraud.* It was a part and an object of the conspiracy that the defendants and others known and unknown to the Grand Jury devised and executed, and aided and abetted each other in devising and executing, a scheme to defraud and to obtain moneys owned by, or in the custody or control of Patriot Bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, by means of material false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code Section 1344.

## Manner and Means

37. BOSTON, LABARGE, and others known and unknown to the Grand Jury carried out the conspiracy in the manner and means as set forth in paragraphs 1 through 31 above.

All in violation of Title 18, United States Code Section 1349.

## COUNT TWO

### 18 U.S.C. § 1343
### (Wire Fraud)

38. The Grand Jury incorporates paragraphs 1 through 31 of this Bill of Indictment and further alleges that:

39. In Catawba County, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) ROBERT M. BOSTON
### (2) ROBERT S. LABARGE

for the purpose of executing and attempting to execute the above-described schemes and artifices to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, would and did transmit and cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, to wit, the wire transfers and emails described above, and others.

All in violation of Title 18, United States Code Section 1343.

## COUNT THREE

### 15 U.S.C. §§ 78j and 78ff
### (Securities Fraud)

40. The Grand Jury incorporates paragraphs 1 through 4, 10, 13, and 15 through 22 of this Bill of Indictment and further alleges that:

41. From at least in or about January 2013 through in or about November 2013, in Mecklenburg and Catawba Counties, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) ROBERT M. BOSTON
### (2) ROBERT S. LABARGE

together with persons known and unknown to the Grand Jury, willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and

artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon ZLOOP investors and others, in connection with the sale of securities, to wit, Series A Preferred Units and convertible promissory notes.

All in violation of Title 15, United States Code Sections 78j and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code Section 2.

## COUNT FOUR
## 18 U.S.C. § 1344(2)
## (Bank Fraud)

42. The Grand Jury incorporates paragraphs 1 through 6, and 20 through 30 of this Bill of Indictment and further alleges that:

43. From at least in or about 2013 through in or about 2015, in Catawba County, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) ROBERT M. BOSTON
### (2) ROBERT S. LABARGE

together with persons known and unknown to the Grand Jury, knowingly executed and attempted to execute a scheme and artifice to obtain money and property owned by, and in the custody and control of Patriot Bank, the deposits of which were insured by the Federal Deposit Insurance Corporation, by means of materially false and fraudulent pretenses, representations and promises.

All in violation of Title 18, United States Code Section 1344(2).

## COUNT FIVE
## 18 U.S.C. § 1001(a)(3)
## (False Writing)

44. The Grand Jury incorporates paragraphs 1 through 6, 20 through 23, and 32 of this Bill of Indictment and further alleges that:

45. On or about July 6, 2016, in Catawba County, within the Western District of North Carolina, the defendant,

### (2) ROBERT S. LABARGE

did willfully and knowingly make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry in a matter within the jurisdiction of the executive branch of the United States, by providing to an agent of the Federal Bureau of Investigation a version of the email attaching the UCC financing statement described in paragraph 23 of this Bill of Indictment bearing the subject line "UCC1 TBF [VICTIM 1]," and stating that this subject line indicated that the attached UCC financing statement was a draft

statement intended to be filed by Victim 1. The statement was false because, as LABARGE then and there knew, the email that he actually sent bore the subject line "UCC1," and did not indicate that its attachment was a draft statement to be filed by Victim 1.

All in violation of Title 18, United States Code Section 1001.

## COUNT SIX
## 18 U.S.C. § 1956(h)
## (Money Laundering Conspiracy)

46. The Grand Jury incorporates paragraphs 1 through 30 of this Bill of Indictment and further alleges that:

47. From at least in or about 2012 through in or about 2015, in Mecklenburg and Catawba Counties, within the Western District of North Carolina, and elsewhere, the defendants,

### (1) ROBERT M. BOSTON
### (2) ROBERT S. LABARGE

did knowingly and willfully combine, conspire, confederate and agree with each other and others both known and unknown to the Grand Jury, to commit the offenses of money laundering, in violation of Title 18, United States Code Section 1957.

48. It was a part and an object of the conspiracy that BOSTON, LABARGE, and others known and unknown to the Grand Jury, would and did knowingly engage and attempt to engage in monetary transactions in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity—to wit, wire fraud and bank fraud—in violation of Title 18, United States Code Section 1957.

All in violation of Title 18, United States Code Section 1956(h).

### NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this bill of indictment;

b. All property involved in such violations or traceable to property involved in such violations; and

c. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) or (b) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a) and (b).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

a. A forfeiture money judgment in the amount of at least $25,000,000, such amount constituting the proceeds of the violations set forth in this bill of indictment;

b. The real property at 6698 Dam Cove Road, Conover, North Carolina, more particularly described in a deed to grantee "Lake Hickory Holdings, LLC," recorded on or about July 7, 2015 at Deed Book 03297, Pages 1458-1459, and further identified as Parcel 374502793020 at Catawba County Register of Deeds;

c. The real property at 964 18th Avenue Circle NW, Hickory, North Carolina, more particularly described in a deed to grantee LaBarge-Diamond Family Trust, LLC, recorded on or about December 19, 2012 at Deed Book 03163, Pages 0367-0368, and further identified as Parcel 3704-17-12-7475 at Catawba County Register of Deeds;

d. The real property at 8102 Evanston Falls Road, Huntersville, North Carolina, more particularly described in a deed to grantee "8102 Evanston Falls Road, LLC," recorded on or about April 1, 2016, at Deed Book 30708, Pages 157-158, and further identified as Parcel 00537851 at Mecklenburg County Register of Deeds;

e. Any and all interest in Lake Hickory Holdings, LLC; LaBarge-Diamond Family Trust, LLC; and 8102 Evanston Falls Road, LLC.

A TRUE BILL:

/ FOREPERSON

JILL WESTMORELAND ROSE
UNITED STATES ATTORNEY

TAYLOR J. PHILLIPS
ASSISTANT UNITED STATES ATTORNEY

DANIEL S. RYAN
ASSISTANT UNITED STATES ATTORNEY